REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 234

September Term, 2013

LARRY BILLY REECE

v.

STATE OF MARYLAND

Krauser, C.J.,
Graeff,
Hotten,

JJ.

Opinion by Graeff, J.

Filed: December 2, 2014

A jury in the Circuit Court for Montgomery County found Larry Reece, appellant, guilty of the following crimes: sex abuse of a minor (Count 1); second-degree sexual offense, fellatio on a minor (Count 2); second-degree sexual offense, making a minor perform fellatio on appellant (Count 3); and second-degree sexual offense, performing anal intercourse on a minor (Count 4). The court sentenced appellant as follows: 15 years on the conviction for sex abuse of a minor; 10 years, consecutive, on the conviction for second-degree sexual offense, performing fellatio on a minor; and 10 years, concurrent, on each of the other two convictions for second-degree sexual offense.

On appeal, appellant presents three questions for our review, which we have reordered and rephrased slightly, as follows:

1.     Did the circuit court err in failing to conduct a sufficient hearing before it admitted child hearsay testimony through Dr. Shukat?

2.     Did the circuit court err in admitting the minor's testimony without allowing appellant to challenge the reliability of the minor's testimony?

3.     Did the circuit court err in permitting the State to alter the time frame specified in the indictment after the trial had begun?

For the reasons set forth below, we answer these questions in the negative, and accordingly, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

R.M., who was seven years old in December 2012, lived with his mother and father, Mrs. M. and Mr. M., his three older sisters, J.M., C.M., and M.M., and his uncle.[1]   They

---

[1] To protect the privacy of the child victim, we shall refer to the child and related
(continued...)

lived next door to appellant, who was 65 years old at the time of trial, for several years. Appellant had dinner with the M. family once a week, and R.M. went to appellant's house, where he and appellant would play games, watch television, and practice using guns. On some occasions, R.M. went to appellant's house alone, and on other occasions, he went with M.M. R.M. referred to appellant as his "buddy."

R.M. testified that appellant first touched him, on what R.M. identified as his "front and back private," in appellant's locked bedroom. R.M. recalled appellant "grabbing money to go to the pool," but then saying "[w]hy don't we do something before we go?" When R.M. asked "what," appellant took off his clothes and "did the F-word to me." Appellant used his hand to touch R.M.'s front private and used his front private to touch R.M.'s back private. R.M. stated that it "felt weird."

On another occasion, while M.M. also was in the house watching a movie, appellant used his mouth to touch R.M.'s front private in appellant's bathroom. Another incident occurred when R.M.'s cousin, B.H. went to appellant's house with R.M. Appellant told them to come into his bedroom. Appellant told B.H. to take off his clothes, but B.H. said no and argued with appellant.

_____

[1](...continued)
family members by their initials.

R.M. described another incident in appellant's bathroom where he put his mouth on appellant's front private. R.M. described appellant's front private as "hairy," and he said it tasted like "rotten cheese."

After R.M. reported the abuse to his mother, she took him to the hospital. Initially, he did not tell the doctors what had happened with appellant because he "was crying a lot." It was not until after his mother calmed him down that he could tell the doctors what had happened. R.M.'s oldest sister, J.M., told R.M. to tell the truth.

M.M., who was thirteen years old at the time of trial, testified that she met appellant when she was six years old and R.M. was a newborn. Appellant was like a "grandpa" to the M. children. He would do everything with them that a grandpa would do, such as play outside, go to the park, and watch television. In the summer of 2011, R.M. and M.M. sometimes would be alone with appellant at his house. On one occasion, appellant told M.M. that R.M. liked to jump on him and play on his bed. M.M. described one incident at appellant's house in the summer of 2011, when R.M. asked her to help him in the bathroom, but appellant stopped her and told her that he was going to do it. M.M. stayed in the living room. In another incident, the entire M. family went to the fair with appellant, and when appellant was leaving, he kissed R.M. on the mouth, which M.M. thought was unusual.

R.M.'s father noticed some unusual behavior between appellant and R.M. in the summer of 2011. On one occasion, at the fairgrounds, he observed appellant kiss R.M. on the mouth. On another occasion, after the M.s returned from a trip to South Carolina,

appellant was in R.M.'s bedroom with the door locked. Another time, two or three months prior to R.M.'s disclosure of the abuse, Mr. M. came home from work and inquired as to R.M.'s whereabouts. His wife told him that R.M. was with appellant, and when he went to appellant's door and knocked, it took appellant "longer than usual," a "minimum of two minutes," to open the door.

That summer, R.M. told his father that his testicles hurt. Mr. M. noticed that R.M. was walking and sitting differently. Three or four days later, on August 22, 2011, the M.s took R.M. to the doctor.

R.M.'s mother testified that she asked appellant to babysit R.M. and M.M. on three occasions that summer. R.M. also went to appellant's house alone on a few occasions, although he usually went with M.M. On one occasion, R.M. and M.M. went to appellant's house to play, but appellant sent M.M. home, saying that he was "going to dedicate an hour to" R.M.

On August 20, 2011, R.M. pointed to M.M.'s crotch and said the word "pussy." When J.M. asked where he learned that word, R.M. "became very nervous and just said forget it."

The following morning, August 21, while Mrs. M. was giving R.M. a bath, R.M. complained to her that his testicles hurt. She asked him why, and R.M. responded that appellant had put R.M.'s privates in his mouth and pulled them, telling R.M. that he was giving him a massage. R.M. also reported that appellant would put his private parts in

R.M.'s behind and in his mouth, and appellant told R.M. that it was okay for appellant to touch him there.

On August 22, Mrs. M. took R.M. to the pediatrician. They then went to Shady Grove Hospital for a sex abuse forensic evaluation.[2] R.M. was nervous because appellant told him that he would be arrested if he said anything. After the doctor told R.M. that if he did not want to speak to her, she would let the police come, R.M. became more scared and said that he would talk to the doctor.

J.M. recorded R.M.'s statements to the doctor at the hospital. She testified that she did so because she wanted the physical evidence.

R.M. did not want to stay at the hospital, and he kept asking to go home. J.M. told her brother to tell the truth. At certain points in the recording, R.M. said "no" to questions about whether R.M. had ever touched any part of appellant with his mouth and whether appellant had ever touched R.M. "where he pooped from." When R.M. responded "no" to those questions, J.M. told him that he needed to tell the truth. R.M. told her that he was answering "no" because he did not want to get appellant in trouble. Eventually, R.M. revealed that appellant had sucked on his testicles and had kissed him on the mouth.

On August 24, 2011, R.M. was referred to Dr. Shukat, a pediatrician with a specialty in child abuse and the medical director of The Treehouse Child Assessment Center.

---

[2] The pediatrician's medical records indicated that, when asked if anyone touched or hurt him, R.M. said: "[N]o" or "I don't remember."

-5-

Dr. Shukat testified that R.M.'s parents were first alerted that there may be an issue after R.M. used the word "pussy," a word that the M.s never used. In conducting her examination, Dr. Shukat explained to R.M. that she was a doctor, and it was her job to talk with him and examine him. She asked R.M. open-ended questions about whether he had ever been touched or hurt in a way that he did not like, to which R.M. "stated immediately" that appellant had touched him with his hands and mouth on his penis and testicles. R.M. stated that appellant's penis went into his "butt," and appellant pushed R.M.'s head down toward his genitals and told him to suck his genitalia. R.M. stated that appellant would also perform the same oral manipulations on R.M.'s genitals. Appellant also showed R.M. pornography, with naked men together and naked men and women together. R.M. described appellant "put[ting] his penis in my butt" as "doing boy stuff," stating that he did not like it and wanted to play normally.

R.M. told Dr. Shukat that he had scrotal pain, in association with appellant sucking his genitalia, and he had pain in his "butt." Upon physical examination, Dr. Shukat discovered two fissures, superficial tears in the skin, along R.M.'s anal opening. Anal fissures are unusual in boys without a history of sexual abuse. R.M. showed Dr. Shukat with his own hands how appellant would manipulate his penis, and he described appellant ejaculating, which he called "white stuff." When he described appellant penetrating R.M.'s anus with his penis, he told Dr. Shukat that "it went in." Dr. Shukat described R.M. as "serious" and "very factual" when talking to her, stating that "[y]ou could tell that he did not

like what had happened to him." R.M. reported that appellant told him to keep what appellant was doing to him a secret, or appellant would get in trouble.

On cross-examination, Dr. Shukat agreed that she did not have knowledge regarding prior discussions that R.M. had with his family members. She was not aware that R.M. had been at Shady Grove Hospital two days prior to her examination.

R.M.'s cousin, B.H., testified that he visited the M.s often in the summers, and he stayed with them for a few weeks in the summer of 2011. He knew appellant from his visits with the M.s, and he said that appellant would teach the children how to play sports and shoot weapons. Appellant always kept snacks in his house for the children.

On one occasion that summer, B.H., who was then thirteen years old, went to appellant's house after R.M. was already there. When B.H. walked into the house, he saw R.M. on his knees on the couch, almost on top of appellant. Appellant told B.H. to come sit on the couch. He told B.H. that he and R.M. "play with each other," and he had pornographic books in his bedroom and pornographic movies in the basement. Appellant then paused the movie that he and R.M. were watching, locked the front door to the house, and took the boys into his bedroom. B.H. sat on the bed, and appellant took five or six pornographic magazines from his drawer. Appellant then laid down on the bed and told B.H. to "look." When B.H. turned to look, appellant was masturbating on the bed. Appellant then grabbed B.H. at his waist and told R.M. to help him take B.H.'s belt off. B.H. said no. A few minutes later, they returned to the living room, and appellant continued to talk about

what he and R.M. did together, telling B.H. that he had pornographic movies in the basement. M.M. then knocked on the door. B.H. never went into the basement, and he did not see the movies. Appellant then took B.H., R.M., and M.M. to Wal-Mart and bought two Transformers.

B.H. testified that this incident occurred before their trip to South Carolina.[3] B.H. never reported the incident because appellant told him that, if he told anyone, "he was going to have trouble," and B.H. was scared that appellant would kill his aunt and uncle.

Detective Torrie Cooke, a member of the Montgomery County Police Department's Youth and Family Crimes Division, began an investigation into the allegations of abuse in August 2011. He executed a search warrant for appellant's house and seized pornographic magazines from a drawer in appellant's bedroom, as well as pornographic videos in the basement.

Appellant denied having any sexual contact with R.M. He testified that he found R.M. and B.H. in his house looking at the pornography.

As indicated, the jury convicted appellant of sex abuse of a minor and three counts of second-degree sexual offense. This appeal followed.

---

[3] The M. family went to Myrtle Beach, South Carolina from August 6 to August 8, 2011.

## DISCUSSION

## I.

### R.M.'s Hearsay Statements to Dr. Shukat

Appellant contends that the circuit court failed to conduct a proper hearing before calling Dr. Shukat to testify to R.M.'s hearsay statements to her. The State argues that the trial court properly admitted R.M.'s statement to Dr. Shukat pursuant to Md. Code (2011 Supp.) § 11-304 of the Criminal Procedure Article ("CP"), asserting that the court "carefully considered each of the factors set forth in the statute before determining that R.M.'s statements to Dr. Shukat had particularized guarantees of trustworthiness."

Pursuant to CP § 11-304, an out-of-court statement to a physician by a child, who is under the age of 13 and alleged to be a victim of sexual abuse, is admissible if certain conditions are met. One of the conditions is that the statement must have particularized guarantees of trustworthiness.

CP § 11-304(e)(2) sets forth a non-exclusive list of factors for the trial court to consider in determining whether a statement meets the requirement of trustworthiness:

> (2) To determine whether the statement has particularized guarantees of trustworthiness under this section, the court shall consider, but is not limited to, the following factors:
>> (i) the child victim's personal knowledge of the event;
>> (ii) the certainty that the statement was made;
>> (iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;
>> (iv) whether the statement was spontaneous or directly responsive to questions;
>> (v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse or neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement.

Subsection (f) requires the court to make an on-the-record finding, outside the presence of the jury, "as to the specific guarantees of trustworthiness that are in the statement" and "determine the admissibility of the statement." CP § 11-304(f). Pursuant to subsection (g), the court, in making a determination under subsection (f), "shall examine the child victim in a proceeding in the judge's chambers, the courtroom, or another suitable location that the public may not attend." CP § 11-304(g)(1).[4]

---

[4] The statute provides that the court does not need to examine the child victim if:

(i) the child victim:
1. is deceased; or
2. is absent from the jurisdiction for good cause shown or the State has been unable to procure the child victim's presence by subpoena or other reasonable means; or
(ii) the court determines that an audio or visual recording of the child victim's statement makes an examination of the child victim unnecessary.

(continued...)

-10-

In reviewing the factual findings required by the statute, we apply the "clearly erroneous" standard of review. *Jones v. State*, 410 Md. 681, 700 (2009). As explained below, we are not persuaded that the circuit court's finding that R.M.'s statements to Dr. Shukat had particularized quantities of trustworthiness was clearly erroneous.

On July 11, 2012, the circuit court held the requisite pretrial hearing on the admissibility of R.M.'s out-of-court statements to Dr. Shukat. Appellant called Dr. Leigh Hagan, a clinical and forensic psychologist, who testified regarding the proper methodology to conduct a forensic evaluation of a minor child.[5] According to Dr. Hagan, in making a CP § 11-304 determination, it was "essential" to consider prior interviews to which R.M. was subjected prior to his interview with Dr. Shukat. Based on Dr. Hagan's review of the records in the case, including the transcript of the recording that J.M. made at the hospital, as well as deposition testimony and reports, all of which was admitted at the hearing, it was significant that R.M. initially denied abuse, but after four hours of questioning, he finally disclosed the abuse. Dr. Hagan expressed concern with "the use of the word disclose," which he viewed as implying that there was something to disclose and a "result-driven way of thinking." He also found some interviewing techniques troubling, such as responding to R.M.'s denial that appellant touched him by saying: "Really?" Dr. Hagan then expressed his

[4](...continued)
Md. Code (2011 Supp.) § 11-304(g)(1) of the Criminal Procedure Article.

[5] The State objected to questions regarding a forensic interview, arguing that Dr. Shukat did not conduct a forensic interview, but rather, R.M. gave her a statement as a medical professional during a medical treatment examination.

thoughts on each of the factors set forth in the statute. He opined that R.M.'s statements did not contain particularized guarantees of trustworthiness, stating that "it is a classic case of unreliability and inconsistency" because R.M.'s answers were "yes, no, yes, no, can't remember" based on who was asking the question, when it was asked, and the attendant circumstances.

Dr. Hagan acknowledged that his practice consisted entirely of reviewing materials in preparation of possible litigation and testifying in court. He also acknowledged that a six-year-old child would be unable to describe fellatio, ejaculation, and anal intercourse unless the child had either experienced it or had been exposed to it in print or electronic media, and that R.M. had described those scenarios in his own words. He agreed that R.M. consistently reported having pain in his testicles.

The State then called Dr. Shukat to testify. After R.M. was referred to her from Shady Grove Hospital, Dr. Shukat performed a medical examination of R.M., which included taking a medical history from R.M.'s parents, with the aid of a Spanish interpreter, taking a history from R.M., and conducting a physical examination. Dr. Shukat was not aware that R.M. had given a statement the previous day to another health care worker, in which he initially denied that he had been touched. Although she acknowledged that would have been "interesting information," she does her own independent assessment.

Dr. Shukat has received extensive training in how to interview children, and she testified that, when she interviews them, she tries to get a feel for what they know and their

cognitive development. She asks the children open-ended questions, and when they are "consistent in their statements and explain sensations associated with their experiences, [she] find[s] that credible for a six-year-old child." It is a "very common phenomenon" for young children not to want to disclose abuse because they are afraid that they will get into trouble or that the abuser, whom they trust, will get into trouble. Dr. Shukat also explained that young children generally are unable to specify the date of the onset of abuse because, developmentally, they do not have a good relationship with timing.

Dr. Shukat, found R.M. to be "very articulate." He told her "very detailed histories of genital pain, genital contact, and what he saw in terms of adult masturbation and ejaculation." R.M. was very specific about cause and effect, and he gave descriptions of having experienced scrotal pain and rectal pain that were consistent with his descriptions of how appellant injured him by sucking on his testicles and by putting his testicles, as R.M. described it, into R.M.'s "butt." R.M.'s statements to Dr. Shukat were consistent with the information that she had obtained from his parents, including that he had complained of scrotal pain and had exhibited behavioral changes prior to his disclosure.

After the hearing, the court ruled that R.M.'s statements to Dr. Shukat were admissible pursuant to CP § 11-304. The court noted that it had "considered Dr. Shukat's report, her deposition, and her testimony at the hearing on July 11th, 2012." With respect to the factors set forth in CP § 11-304(e), the court stated as follows:

> [T]he first one is the child victim's personal knowledge of the event. [R.M.]
> had personal knowledge of the event at the time he made the statement to

-13-

Dr. Shukat. He was able to explain where he was, what he was doing, and what the defendant had allegedly done to him. Dr. Shukat adequately described the circumstances surrounding the statement. The fact of the statement to Dr. Shukat may have been different from other statements that [R.M.] made as a matter for cross-examination of the adults, who will be testifying as well as [R.M.] in order to [assess] its credibility.

Two: the certainty that the statement was made. Dr. Shukat had ascertained that the statement was made and indicated as such in her report and during her testimony. Three: any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion. Although there may have been some coercion of [R.M.] when he was kept for about four hours with his sister and the nurse asking suggestive questions – that does not mean that [R.M.] was not truthful in his statements to Dr. Shukat. Four: [whether] the statement was spontaneous or directly responsive to questions? The statement to Dr. Shukat was directly responsive to questions, but the questions were open-ended and not suggestive. Five: the timing of the statement. The statement was made shortly after [R.M.] told his parents about what happened, but it is not clear when the alleged events occurred. Six: whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience. Due to [R.M.'s] young age, it is unlikely that he fabricated the statement, because his account provides details beyond his expected knowledge and experience. Seven: the appropriateness of the terminology of the statement to the victim's age. [R.M.] did not use terminology in such a way that it would appear that someone had told him to say those words. Eight: the nature and duration of the abuse or neglect. The nature and duration is several months. Nine: the inter-consistency and coherence of the statement. The statement itself was consistent and coherent. It was not, however, consistent with other statements that [R.M.] told to other people. Ten: whether the child victim was suffering pain or distress when making the statement. [R.M.] was not distressed when he made the statement. Eleven: whether extrinsic evidence exists to show[] the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement. Extrinsic evidence exists to show the defendant had the opportunity to commit the act, although perhaps not on the date alleged.

Twelve: [whether the] statement was suggested by the use of leading questions? Dr. Shukat did not use leading questions. And thirteen: the

-14-

credibility of the person testifying about the statement. Dr. Shukat is credible. There is no evidence that she testified to anything other than what [R.M.] told her or what she did in the course of her examination.

The court then stated that, pursuant to CP § 11-304, it had examined R.M. on December 3, 2012, in the courtroom. Noting that defense counsel disagreed with the types of questions that the court asked R.M., which disagreement is reiterated on appeal, the court stated:

> I asked basic questions of [R.M.] to determine if he could testify truthfully. During my examination of [R.M.], he was able to answer my questions concerning his name, address, age, school, grade, teachers, whether he's a good student, and he said report cards will be coming out soon – whether he can read or write. He knew the difference between telling the truth and telling a story or a lie. He adequately explained the difference. At home, there are consequences if he does not tell the truth.
>
> Everything that I asked [R.M.], as to whether something was real or not, he knew what was real and what was not real. I asked him to tell me something that wasn't true, and he was able to do so. He knew where he was. Although he seemed a little confused when I asked him, "What happens if you don't tell the truth in court?" He seemed to think that only guilty people were punished. I don't find that to be significant, given his age and experience. [R.M.] told me about what he did this summer. He told me about his dog, and how old his dog is, food he can cook, what TV programs he watches, movies he had seen, and he knew that they were not all real. He told me about books that he had read, and was able to identify books that Dr. Seuss had written. Overall, I found [R.M.] to be an intelligent child who was competent to testify.
>
> [R.M.] was born March 3rd, 2005, making him now seven years old. The criminal charges are child abuse, under section 3602, and sexual offense, under section 3306 of the criminal law article. Dr. Shukat is a qualified professional. Based on the factors set forth in section 11-304E2 and my examination of [R.M.], I find particularized guarantees of trustworthiness. Accordingly, [R.M.'s] out-of-court statement to Dr. Shukat is admissible under criminal procedure 11-304.

Appellant's claim that the trial court "only superficially addressed the factors" set forth in CP § 11-304 is belied by the record. The court heard testimony, considered all the evidence adduced, and specifically addressed each of the factors set forth in CP § 11-304. Because there was evidence to support the factual findings, they were not clearly erroneous. *See Kusi v. State*, 438 Md. 362, 380 (2014) (A "'judge's decision is not clearly erroneous if the record shows that there is legally sufficient evidence to support it.'") (quoting *Biglari v. State*, 156 Md. App. 657, 668 (2004)).

Appellant suggests that, before making a finding that R.M.'s statement to Dr. Shukat had particularized qualities of trustworthiness, the court was required to question R.M. about the charged offenses and to elicit from R.M. the "facts surrounding the allegations, the questioning by his sister or parents, or the drawn out four-hour long follow up interrogation at the hospital." Appellant, however, cites no authority to support his argument that the statute requires such an inquiry.

Here, the court examined R.M. as required by the statute. It determined that R.M.'s statements to Dr. Shukat had particularized guarantees of trustworthiness. The court conducted the requisite analysis, and its findings were not clearly erroneous. The circuit court properly admitted into evidence R.M.'s statements to Dr. Shukat.

## II.

## R.M.'s Trial Testimony

Appellant's next contention involves the admissibility of R.M.'s testimony. Appellant asserts that he is entitled to a new trial because the circuit court violated his right to due process by denying his request for a pretrial taint hearing.[6] Specifically, he asserts that he should have been permitted to challenge the reliability of R.M.'s testimony, i.e., whether it was the product of suggestion or coercion during the interview process. In that regard, he argues that he should have been permitted to question R.M., his parents, and his sister about the questions R.M. was asked. Recognizing that there is no Maryland authority to support his position, appellant relies primarily on a New Jersey case, *State v. Michaels*, 642 A.2d 1372,1380-84 (N.J. 1994), in which the New Jersey Supreme Court took the "somewhat extraordinary" step of requiring a pretrial "taint" hearing to determine if a child victim's trial testimony was unreliable.

The State responds in several ways. First, it argues that appellant's due process claim is not preserved for this Court's review because, although appellant asked for a "taint" hearing, he failed to raise the constitutional claim he raises on appeal. It further argues that "the notion of a pretrial hearing to exclude an entire category of witnesses (children) is antithetical to Maryland competence law." It notes that, pursuant to Md. Rule 5-601, every

---

[6] "Taint" has been defined as "the implantation of false memories or distortion of actual memories through improper and suggestive interview techniques." *Commonwealth v. Delbridge*, 855 A.2d 27, 30 (Pa. 2003).

person, including a child, is presumed to be a competent witness, and it asserts that appellant's argument that "children's testimony should be treated differently from the testimony of other witnesses amounts to a claim that children, as a category, are inherently unreliable." Finally, it contends that, because appellant "was given liberal leave to explore R.M.'s credibility at trial," including presenting "defense expert testimony that [R.M.'s] testimony was influenced by allegedly suggestive interviews, his due process claim must fail."

## A.

### Preservation

We address first the State's preservation claim. In the circuit court, appellant filed a "Motion for a Competency/Taint Hearing," requesting the court to hold a hearing to cross-examine [R.M.] as to "outside influences that may have impacted his memory and therefore his competency."[7] Appellant asserted that the "current competency test that Maryland has endorsed is a meaningless inquiry of truth/lie and a recognition of colors," and a proper test, as followed by New Jersey courts, requires the complainant to have "an independent recall of the events in question."

On November 20, 2012, the court heard argument on the motion. Appellant's counsel argued that, on the day prior to Dr. Shukat's examination of R.M., R.M.'s sister, J.M., had "press[ed]" R.M. and "beat[] on him" while they were at the hospital to "tell the whole

_____

[7] The motion apparently was filed in the wrong case, but it subsequently was brought to the court's attention and ruled upon.

-18-

truth." Counsel asserted that R.M.'s recall of events was not his own, but rather, it was the result of "what was fed to him and suggested to him." He argued that a taint hearing would address whether R.M. was "competent because he has free recall" or incompetent because what he remembers "is the product of what has been told to him."

The State responded that, by asking the court to hold a hearing to determine whether R.M.'s recollection was his own, appellant was asking the court to make a determination that was in the province of the jury, i.e., to make a credibility determination. The State asserted that appellant could present the transcript of J.M.'s recording of the events at the hospital at trial and argue to the jury that R.M.'s testimony was not credible.

After hearing counsels' arguments, the court ruled:

> Now, with respect [to] the motion for taint hearing, I'm denying that because it's not for the court to determine whether [R.M.] was influenced by his sister or the interviewer in that case. The defense indicates that the court has to determine whether or not [R.M.] is competent because he has free recall or if it's a product of what he remembers versus a product of what's been told to him. I don't think there's any way that I could do that. To me, it's up to the experts and up to counsel to make that argument, for the experts to testify about it, and up for counsel to make that argument. I don't think that's the purpose of [CP §]11-304, so I'm not going to hold a taint hearing. Now, I understand the defense's concerns; I have read that transcript and there are some areas that are concerning. So, I'm not sure how you want to handle this, but the defense will be given substantial leeway in the use of this transcript in the trial. [8]

---

[8] Appellant again raised this issue in his motion for new trial. He argued that R.M.'s statements were "the product of suggestion by the interview process and by the family," and the court should have held a "taint hearing." The court stated that Maryland "has not recognized that the tainted interview process renders a witness incompetent," and that, in determining whether the statement that [R.M.] made to Dr. Shukat was admissible, the court

(continued...)

To be sure, appellant did not stress below the due process aspect of his argument. He did, however, clearly rely on the Supreme Court of New Jersey's decision in *Michaels*, which relied on principles of due process in deciding that a pretrial hearing was required. In the circumstances of this case, we conclude that the claim was sufficiently preserved for our review.

**B.**

**Pretrial Taint Hearing**

As indicated, appellant's argument that a pretrial "taint" hearing was required is based on the Supreme Court of New Jersey's decision in *Michaels*, where a nursery school teacher was convicted of "bizarre acts of sexual abuse" against numerous young children. 642 A.2d at 1374. With regard to many of the children, the charges were not the result of spontaneous reports of abuse, but instead, they were the product of "repeated, almost incessant," interviews conducted by untrained investigators who used a number of suggestive techniques, including leading questions that furnished information about what other children had alleged, vilification of the defendant, and rewards to children who helped "keep [the defendant] in jail." *Id.* at 1380.

Given the "highly improper" and suggestive interviews, the New Jersey court took the "somewhat extraordinary" step of concluding that a pretrial hearing was necessary to assess the reliability of the child witnesses. *Id.* The court held that, if a defendant produces "some

[8](...continued)
"followed the current law in Maryland."

-20-

evidence" that the State conducted suggestive interviews, a hearing is required to determine whether the improper interviews affected the ability of the children to recall the alleged events, and if so, the extent that the testimony based on that recollection is unreliable and inadmissible. *Id.* at 1380, 1383.

As appellant notes, the Maryland appellate courts have never held that a separate pretrial taint hearing is required in a child sex abuse case. We decline to do so here.

The "majority of jurisdictions" that have considered the issue "have rejected the *Michaels* approach on the ground that existing procedures that address the competency and credibility of witnesses are adequate to deal with concerns regarding child testimony." *State v. Michael H.*, 970 A.2d 113, 121 (Conn. 2009). *Accord People v. Montoya*, 57 Cal. Rptr. 3d 770, 778 (Cal. Ct. App. 2007) ("Like other states, we reject *Michaels* in favor of our well-established competency jurisprudence."); *State v. Karelas*, 28 So. 3d 913, 915 (Fla. Dist. Ct. App. 2010) ("Like the majority of jurisdictions that have considered *Michaels*, we reject its conclusion."); *State v. Ruiz*, 150 P.3d 1003, 1008 (N.M. Ct. App. 2006) ("New Mexico rejects *Michaels* in favor of our well-established competency jurisprudence."), *cert. denied*, 152 P.3d 150 (2007); *State v. Olah*, 767 N.E.2d 755, 760 (Ohio Ct. App. 2001) ("the trial court did not err in failing to conduct a pretrial taint hearing" of the child witness); *Reyes v. State*, 274 S.W.3d 724, 732 (Tex. App. 2008) ("[W]e decline the invitation to adopt the *Michaels* procedure."); *In re Dependency of A.E.P.*, 956 P.2d 297, 307 (Wash. 1998) (*en banc*) ("We decline to adopt a pretrial taint hearing as a requirement."); *State v. Smith*, 696

S.E.2d 8, 16 (W. Va.) (refusing to require trial courts to hold taint hearings), *cert. denied*, 131 S. Ct. 579 (2010).

We find instructive the analysis of the Court of Appeals of Oregon in *State v. Bumgarner*, 184 P.3d 1143 (Or. Ct. App.), *review denied*, 190 P.3d 1237 (2008), *cert. denied*, 555 U.S. 1101 (2009), which rejected the *Michaels* approach for several reasons. Initially, the court stated that the creation of a taint hearing procedure in *Michaels* was based on United States Supreme Court precedent regarding eyewitness identification testimony.[9] The Supreme Court, however, had not "extended the need for a pretrial determination of reliability for due process purposes beyond the narrow setting of eyewitness identification," and the Oregon court found "no reason to accord a second category of evidence the extraordinary treatment that courts have given to eyewitness identification testimony." *Id.* at 1151.

More importantly, the court stated that "the trier of fact, rather than the judge, is in the best position to determine the effect, if any, of improper interviewing techniques on a witness's credibility." *Id.* Noting that Bumgarner was permitted to introduce before the jury expert testimony regarding the claimed deficiency in the interview of the victim, the court stated that "[d]ue process requires no more." *Id.* at 1152.

---

[9] In *State v. Michaels*, 642 A.2d 1372, 1381 (N.J. 1994), the New Jersey Supreme Court stated that, although assessing reliability as a predicate to the admission of testimony was "somewhat extraordinary," it was "not unprecedented," citing *Manson v. Brathwaite*, 432 U.S. 98 (1977) (authorizing hearing to determine admissibility of in-court identification testimony based on pretrial suggestiveness).

In Maryland, the appellate courts have made clear that the credibility of witnesses is a matter that falls squarely within the province of the jury. *See, e.g., State v. Stanley*, 351 Md. 733, 750 (1998) ("Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder."); *Steward v. State*, 218 Md. App. 550, 559 (2014) (same). Whether improper interviewing techniques were employed in questioning a witness and whether that affected the witness' credibility were issues for the trier of fact to resolve.

Due process does not require a pretrial "taint" hearing to assess whether there was improper interviewing techniques. Rather, any such evidence can be introduced at trial for the trier of fact to evaluate.

Here, appellant was permitted to present testimony from Dr. Hagan regarding his allegations of suggestion in the interviews of R.M. Appellant also was able to cross-examine R.M., his sisters, his parents, and Dr. Shukat, and to argue to the jury that R.M.'s allegations should not be believed. Under these circumstances, where appellant was permitted to present evidence at trial that R.M.'s memory had been tainted by interviewers, there was no due process violation. Appellant's contention to the contrary is devoid of merit.

### III.

### Indictment

Appellant next contends that the court "erred in permitting the State to alter the time frame specified in the indictment after the trial had begun." He asserts that the State chose

to delineate a narrow time frame in the indictment, and the State was required to prove that the offenses occurred during that time frame. The court, however, permitted the State to admit testimony "without reference to any time frame" and "submitted the verdict sheet without any dates at all." He argues that the court erred in allowing this "change in midstream," which he asserts was "overwhelmingly prejudicial to him."

The State contends that "the trial court properly permitted the State to adduce evidence that the offenses took place during the summer of 2011 where the charging document alleged that the offenses occurred 'on or about and between August 15, 2011, through August 19, 2011.'" It argues that the case law is clear that the State is not required to prove that the offenses took place in the time period alleged in the indictment. Moreover, it disputes appellant's assertion that he was "severely prejudiced" by the proof adduced at trial, asserting that appellant was on notice that the State's proof would not be limited to the dates alleged in the indictment.

**A.**

**Proceedings Below**

The indictment alleged that appellant committed the offenses "on or about and between August 15, 2011, through August 19, 2011." Prior to the start of trial, during a discussion regarding proposed jury instructions, appellant's counsel argued that the State had to prove that the offenses occurred during the time frame in the indictment. The State responded that, based on the nature of the offense and that R.M. was a very young child, the

State was not required to prove the date, which was not an element of the crime. Subsequently, during opening arguments, appellant's counsel stated that the evidence would show that, between August 15 and August 19, appellant had little contact with R.M., and the contact that he did have with R.M. during that time frame was supervised. During trial, appellant's counsel examined and cross-examined witnesses regarding the dates in the indictment.

During R.M.'s testimony, he was not able to specify the dates on which the offenses occurred. Appellant's counsel objected to testimony that was not "put in a time frame," and the court sustained the objections. The State responded by stating:

> I don't know what to do [other] than to direct him to the end of August 2011. I think that as an officer of the court, and I can represent for [appellant's counsel], that [R.M. has] never been able to get any more specific in terms of the date range, because of the age that he was at that time. I think that if I can direct him to that specific time period, I think that I'm allowed that latitude in terms of my questioning.

The court ultimately ruled that it would allow the testimony, stating that it would revisit the issue during a motion for judgment of acquittal.

During M.M.'s testimony, the time frame again became an issue. The State wanted to elicit testimony from M.M. that appellant kept toys in his bedroom to corroborate that R.M. was in his bedroom and appellant had the opportunity to abuse him. Appellant's counsel responded that the State could not elicit the testimony without a time frame. The State responded that, pursuant to *Crispino v. State*, 417 Md. 31 (2010), it did not have to prove that the offenses occurred on the dates alleged in the indictment, as long as it could

prove that it happened before the indictment was filed. The court responded that the State could not "keep changing theories as you go along," but it stated: "I'm going to let you question her about the toys, but I want to [read] that case."

After the court read *Crispino*, further discussion ensued, and the court stated that it would "allow the testimony concerning other dates that were not specified in the indictment." It also stated that the verdict sheet would not include dates.

After the conclusion of the State's case, appellant moved for judgment of acquittal, which was denied. At the close of all evidence, appellant renewed his motion arguing, *inter alia*, that the State had not proven that the offenses occurred during the time frame alleged in the indictment. The State responded that it had "directed all witnesses to the summer of 2011," and that the "dates alleged are on or about." The court ruled that, based on *Crispino*, "as long as the evidence is produced of occurrences before the indictment, that is sufficient," and it was a "matter of credibility as to whether or not the abuse occurred . . . during the summer of 2011."

**B.**

**Variance in the Time Alleged in Indictment and Proof at Trial**

The Court of Appeals has made clear that, because the date of an offense generally is not an element of the offense, a variance between the time period alleged in the indictment and the proof at trial is not fatal to a conviction. *Fulton v. State*, 223 Md. 531, 532 (1960) ("The State was not confined in its proof to the date alleged in the indictment."); *Greenwald*

*v. State*, 221 Md. 245, 252 (1960) ("In criminal cases generally the state is not limited to the date set out in the indictment but may show that the crime charged occurred at any date within the period of limitations."); *Mazer v. State*, 212 Md. 60, 67 (1956) (Proof of guilt not limited to date in indictment).

More recently, the Court explained:

> With respect to a variance from the time period alleged and that adduced at trial, we have stated that the time period proven need not coincide with the dates alleged in the charging document, so long as the evidence demonstrates that the offense was committed prior to the return of the indictment and within the period of limitations.

*Crispino*, 417 Md. at 51-52. Accordingly, the circuit court here did not err or abuse its discretion in limiting the State's evidence to the dates alleged in the indictment.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**